FILED

2005 Mar-02  PM 03:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| NEST USA, INC., WILLIAM C. WOOD, JR., and JEMISON INVESTMENT CO. INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CIVIL ACTION NO.:  CV-04-HS-0138-S |
| John Shaw and Edward Shaw, | ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OF OPINION ON DEFENDANTS' MOTION TO DISMISS**

**I.  Introduction and Procedural History**

This is a civil action, filed on January 23, 2004, by Plaintiffs Nest USA, Inc.("Nest"), a

Delaware corporation; Jemison Investment Co. Inc.("Jemison"), a Delaware corporation; and

William C. Wood Jr.("Wood"), an individual citizen of Alabama, against Defendants John Shaw and

Edward Shaw.

In the instant action, the Plaintiffs seek relief for violations of the Securities Act of 1934 and

Rule 10b-5 (Count I); violations of the Alabama Securities Act, ALA. CODE § 8-6-1 et seq.  (Count

II); intentional, reckless, negligent misrepresentation (Count III); fraudulent suppression (Count IV);

and civil conspiracy (Count V).

Presently before the Court is Defendants' Motion to Dismiss the Complaint (Doc. 4), filed

on February 18, 2004, on the following grounds:  (1) failure to state a claim upon which relief may

be granted, (2) improper venue, (3) lack of subject matter jurisdiction, (4) lack of personal

jurisdiction over the Defendants, and (5) failure to bring the instant claims as compulsory

counterclaims in *Edward Shaw v. Marwan Atalla*, *et al.*, District Court of Harris County, Texas, No.

2003-58471 (the "Harris County Suit").  *See generally* Doc. 4.

## II.  Standard of Review

"When considering a motion to dismiss for failure to state a claim, a court must accept the allegations in the complaint as true, construing them in the light most favorable to the plaintiff." *Murphy v. FDIC*, 208 F.3d 959, 962 (11th Cir.  2003) (quoting *Kirby v. Siegelman*, 195 F. 3d 1285, 1289 (11th Cir.  1999)).  Unless it appears beyond doubt that the Plaintiffs could prove no set of facts entitling them to relief, neither the Complaint nor any count therein may be dismissed.  *Conley v. Gibson*, 335 U.S. 41, 45-36 (1957); *Harris v. Proctor & Gamble Cellulose*, 73 F. 3d 321, 324 (11th Cir. 1996).

## III.  Allegations of the Complaint[1]

This suit arises from a series of business transactions between Plaintiffs and Defendants relating to offers to sell, sales of, and purchases of securities within the meaning of the  Securities and Exchange Act of 1934 (the "1934 Act") and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78j(b) and 78t(a).  (Doc. 1 ¶ 9).  The securities at issue  are membership interests in two distinct but related entities, Shaw Holding, LLC ("Shaw Holding"), an Alabama limited liability company; and Progressive Systems, LLC ("Progressive"), an Alabama limited liability company.  (Doc. 1 ¶ 9).

On or about November 6, 1998, John Shaw organized Progressive.  Shaw Holding, a company created to own shares of membership interest in Progressive, was Progressive's original

---

[1]The Court understands that the allegations set forth in the Complaint are strictly those of the Plaintiff. Given the standard of review, the Court must accept such allegations as true for the purpose of granting or denying a motion to dismiss.

member.  Progressive specializes in developing, marketing, installing, and servicing closed circuit television systems.  (Doc. 1 ¶ 10).  Shaw Holding has engaged in no business activity other than owning membership interests in Progressive.  Shaw Holding's original members were John Shaw and Edward Shaw.  (Doc. 1 ¶¶ 9-10).

Beginning in late December, 2001, Plaintiffs loaned money to Progressive and in return acquired notes and shares of membership interests in Shaw Holding (and/or Progressive).  (Doc. 1 ¶ 12).  Plaintiffs allege that, during the course of transactions taking place in late 2001 and the first quarter of 2002, Shaw Holding (and/or Progressive) were represented by two brothers,  John Shaw and Edward Shaw.  They also allege that, at all relevant times, the Shaws acted for themselves and on behalf of Shaw Holding (and/or Progressive) as controlling persons within the meaning of Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a).  (Doc. 1 ¶ 12).

The Complaint states that,  "the Shaws conspired and engaged in a concerted effort to defraud Plaintiffs out of millions of dollars."  (Doc. 1 ¶ 13).   The Complaint further states that, "in connection with loans to Progressive, Progressive's issuance of notes and shares of membership interest to Plaintiffs, and John Shaw's sale of his share of membership interest in Shaw Holding to Plaintiffs, the Shaws misrepresented and/or omitted material facts regarding Progressive's business, financial condition, and results of operation; the value of shares of membership interest in Progressive; the timing and value of sales by Progressive; the existence of certain software licenses; and the status of a certain patent."  (Doc. 1 ¶ 13).

On or about December 28, 2001, Nest and Wood entered into a Financing Agreement ("Financing Agreement") with Progressive, Shaw Holding, and Joseph T. McSorley, by which Nest

and Wood agreed to arrange a $1.5 million credit facility for Progressive. (Doc. 1 ¶14).  Under the Financing Agreement, Nest and Wood each agreed to provide Progressive access to as much as $750,000 through July 2, 2004.  In consideration for said obligation, Progressive issued 171,662 shares of membership interest in Progressive to Wood and 171,662 shares of membership interest in Progressive to Nest.  (Doc. 1 ¶¶ 16-17).

In connection with the Financing Agreement,  Progressive made various representations and warranties.  Progressive represented that it was "in compliance with every applicable law, rule, regulation, ordinance, license, permit, and other governmental action and authority and every order, writ, and decree of every governmental entity in connection with the ownership, operation, and maintenance of its business and its assets ..." (Doc. ¶ 18).  Additionally, the Complaint states that in the Financing Agreement, Progressive represented that it had delivered "true and correct copies of its financial statements for the calendar year of 2000 and for the period of January 1, 2001 to October 31, 2001... in accordance with generally accepted accounting principles." (Doc. 1 ¶¶ 18-19).

In early January, 2002, after entering into the Financing Agreement, Nest and Wood entered into the Revolving Credit and Security Agreement by Progressive ("Revolving Credit Agreement") with Progressive.  The Revolving Credit Agreement provided representations and warranties to the lenders similar to those in the Financing Agreement. (Doc. 1 ¶¶ 23-25).  The Revolving Credit Agreement also outlined events of default that would trigger certain rights in Nest and Wood.  (Doc. 1 ¶ 25).  Progressive issued a Revolving Note to Nest and Wood in connection with the Revolving Credit Agreement that was payable on demand, but not later than July 2, 2004.  (Doc. 1 ¶¶ 26-29).

On or about February 27, 2002, through the operation of an agreement ("John Shaw Agreement"), Nest and Jemison, together with others, purchased for $2.63 million all of John Shaw's shares of membership interest in Shaw Holding. Nest paid $2.104 million of the total purchase price, thereby acquiring a controlling interest in Shaw Holding and Progressive.  The aforementioned agreements, loans, and purchases are the subjects of this suit.  (Doc. 1 ¶¶ 30-31).

As to the loans and purchases of securities, Plaintiffs assert that they learned, sometime after February, 2002, that the Shaws had made (and/or caused Progressive to make) untrue statements of material fact, and had failed and refused (and/or caused Progressive to fail or refuse) to state material facts necessary to make their representations, in light of the circumstances under which they were made, not misleading.  (Doc. 1 ¶ 32).

In connection with and in furtherance of the loans and acquisitions, the Complaint stated that the Shaws made the following misrepresentations and omissions:

(a)  They provided inaccurate, incomplete, and misleading financial statements that grossly misstated Progressive's financial condition and results of operation;

(b)  They misrepresented the value of Progressive's shares of membership interest–that is, those shares were represented to possess a higher value than they actually possessed;

(c)  They misrepresented the timing of the revenue Progressive expected to receive from sales to the Cleveland Municipal School District ("CMSD") and the District of Columbia Public Schools ("DCPS");

(d)  They misrepresented the profit margins expected from the CMSD and DCPS sales;

(e)  They represented that Progressive was expecting certain service revenues in fiscal year 2002, but failed to disclose that Progressive had already received $1 million of those revenues in 2001;

(f)  They misrepresented that Progressive would incur no indebtedness in excess of the $1.5 million indebtedness Progressive incurred through the Revolving Credit Agreement and the Revolving Note.

(g)  They failed to disclose that Progressive was using, marketing, and distributing certain third party software without licenses;

(h)  They misrepresented and suppressed the status of a certain patent;

(I)  They misrepresented that Progressive was in compliance with applicable laws; and

(j)  They failed to disclose that certain of the systems installed by Progressive were defective, such that Progressive suffered customer complaints and technical problems that hindered its ability to market and sell its products and services.

(Doc. 1 ¶ 33).

As to the Agreements and Notes, the Complaint states that the Shaws represented (and/or caused Progressive to represent) that Progressive had received $10,482,029 in system sales and $1,395,158 in service fees, for total revenues of approximately $11.9 million, for the ten months ending on October 31, 2001.   The Plaintiffs contend that an audit of Progressive's financial statements ending in November, 2002 revealed that for the entire calendar year of 2001, Progressive's total revenues were at least $300,000 less than what the Shaws represented (and/or caused Progressive to represent) their numbers to be on October 31, 2001.  (Doc. 1 ¶¶ 35-36). Plaintiffs further assert that an audit revealed that the Shaws had misrepresented (and/or caused Progressive to misrepresent) Progressive's expenses and net income (loss) for the ten months that ended on October 31, 2001.  (Doc. 1 ¶ 37).   Plaintiffs claim that the audit also revealed that the Shaws overstated Progressive's net worth as of December 31, 2001.  (Doc. 1 ¶ 39).

Plaintiffs further allege that the Shaws provided "materially false forecasts of Progressive's immediate future performance," including the representation that sales to CMSD and DCPS were imminent.  (Doc. 1 ¶¶ 40, 44).  The Complaint also states that the Shaws had no reasonable basis for making such forecasts.  (Doc. 1 ¶ 45).   Additionally, the Complaint alleges that the Shaws represented that Progressive would incur no additional indebtedness in excess of its debt incurred through the Revolving Credit Agreement and Revolving Note.  (Doc. 1 ¶ 46).

Plaintiffs contend that, in March, 2002, Plaintiffs began to discover that the Shaws'

6

representations regarding the following were untrue:  Progressive's financial condition on October 31, 2001, and on December 31, 2001;  results of operation for the ten and twelve months then ended;  the cash flow; and the CMSD and DCPS transactions.  (Doc. 1 ¶ 48)

According to the Complaint, Progressive had $19,000 in cash in March, 2002, and, in April, 2002,  $166,921 in cash.  Progressive required money to continue operations, and, to avoid selling off shares of membership interests and further diminishing the value of the investments, Progressive was forced to borrow money from Nest.  (Doc. 1 ¶ 49).

Plaintiffs further contend that the Shaws represented that John Shaw had invented "revolutionary new detection and security technology" ("BeThereConnection") and that the patent for such technology, which would substantially increase the value of shares, was "imminent."  (Doc. 1 ¶¶ 50-51).  On approximately February 26, 2001, John Shaw assigned to Progressive the BeThereConnection patent application, which was subsequently rejected in September because it contained elements and limitations existing in previously-patented technology.  (Doc. 1 ¶ 54).

The Complaint states that, through the Shaws, Progressive incurred significant liability to computer software companies represented by Business Software Alliance ("BSA").  (Doc. 1 ¶ 55).  It further states that  Progressive illegally used, copied, and distributed software protected by federal copyright laws.  (Doc. 1 ¶ 56).  Plaintiffs claim that the Shaws knew and failed to disclose that, on a number of occasions when Progressive sold security systems with operating software, Progressive did not obtain the proper license from the authors and distributors of the software.  (Doc. 1 ¶ 56).

The Complaint states that, in mid-2002, BSA contacted Progressive and informed Progressive that it had information regarding Progressive's infringement on numerous software

copyrights.   (Doc. 1 ¶ 57).   As a result of an audit, BSA contended that Progressive's liability for

such infringement exceeded $500,000.   Plaintiffs assert that Progressive, in an effort to avoid

potential liability, entered into a settlement agreement with BSA, pursuant to which it paid $60,000

and agreed to destroy any remaining unlicensed software.   (Doc. 1 ¶ 57).   Plaintiffs claim that

Progressive incurred additional expenses exceeding $10,000 for attorney fees and settlement costs

and will incur future costs to purchase the licenses it should have purchased but for the Shaws'

wrongdoing.   In total, Progressive has spent and will spend approximately $200,000 acquiring

licenses for the unlicensed software it has used and/or distributed.   (Doc. 1 ¶ 58).

### IV.  Applicable Substantive Law and Analysis

### A.  Violations of the Securities Act of 1934 and Rule 10b-5 Under PSLRA

Section 10(b) of the 1934 Act makes it unlawful for any person "to use or employ, in

connection with the purchase or sale of any security... any manipulative or deceptive device or

contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C.

§ 78j(b).   Rule 10b-5 makes it illegal for any person "to make any untrue statement of material fact

or to omit to state a material fact necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b05.   To state a

claim under Section 10(b) of the 1934 Act and Rule 10b-5, Plaintiffs must allege: (1) a misstatement

or an omission, (2) of material fact, (3) made with scienter, (4) on which plaintiffs relied, and (5) that

proximately caused the plaintiffs' injury. *Bryant v. Avado Brandt, Inc*., 187 F.3d 1271, 181 (11th Cir.

1999); *Nathanson v. Zonagen, Inc*., 267 F.3d 400, 406-407 (5th Cir. 2001).   Plaintiffs must plead

their Rule 10b-5 claims in compliance with both Fed.R.Civ.P. 9(b) and 15 U.S.C. Section 78u-4 of

the Private Securities Litigation Reform Act (PSLRA).  *Id.*  According to Fed. R. Civ. P. 9(b), "the circumstances constituting fraud...shall be stated with particularity."  Under PSLRA, for any private action arising under  15 U.S.C.A.78u-4, in which the plaintiff alleges that the defendant either "made an untrue statement of a material fact, or omitted to state a material fact necessary in order to make the statements made... not misleading," the complaint "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C.A.78u-4(b)(1).

Plaintiffs have alleged various misrepresentations and omissions of material facts regarding "inaccurate, incomplete and misleading financial statements," including misrepresentation of the value of Progressive's shares of membership interest,  misrepresentation of profit margins, certain service revenues, and inaccurate forecasts. (Doc. 1 ¶ 33).  The Plaintiffs alleged that Defendants had "no reasonable basis for making those forecasts."  (Doc. 1 ¶ 42).  The Complaint did not set forth the basis for Plaintiff's belief that the Shaws had no reasonable basis for making forecasts, which is required by the statute.  15 U.S.C.A.78u-4(b)(1).  Plaintiffs also failed to state the reason(s) why statements were false or misleading, nor did they state with particularity the basis for their beliefs upon which they based all of their allegations.  Plaintiffs' allegations  were overall conclusory by nature and insufficient to meet  the proper pleading standard required by the law.

Under PSLRA, conclusory allegations of scienter do not suffice to meet the standard of particularity.[2]  PSLRA requires that, whenever plaintiffs are seeking monetary damages based upon

---

[2] Under *Bryant v. Avado, 187 F.3d at 1285,* the Eleventh Circuit has also held that allegations of motive are not sufficient to satisfy the scienter element of a Rule 10b-5 claim.

a defendant's particular state of mind, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C.A.78u-4(b)(2).  Scienter, the required state of mind for a 10(b) claim,  is a "mental state embracing intent to deceive, manipulate, or defraud." *Bryant*, 187 F.3d at 1282 (citing *Ernst and Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 1381 n.12, 47 L.Ed.2d 668 (1976)).  The Eleventh Circuit has held "that a complaint alleging with particularity that a defendant acted with a severely reckless state of mind still suffices to state a claim for civil liability under §10(b) and Rule 10b-5. *Bryant*, 187 F.3d at 1283.  Therefore, the issue is whether the Complaint alleges with particularity facts that Defendants acted with a severely reckless state of mind.

In their Complaint, Plaintiffs have alleged that Defendants "made such material misrepresentations and/or omissions with the intent to deceive, manipulate, or defraud Plaintiffs–that is [defendants] made such material misrepresentations and/or omissions consciously with the intent to defraud or with a high degree of recklessness." (Doc. 1 ¶¶ 63, 70).  Plaintiffs also allege, "the [Defendants] knew such representations were false, but made such representations intentionally, recklessly, and/or negligently with the intent that Plaintiffs should rely upon them." (Doc. 1 ¶ 78; *see also* ¶ 83). Plaintiffs may not rely on rote conclusory allegations that Defendants "knowingly" or "recklessly" did something, but must instead plead with particularity facts that indicate Defendants' intent to misrepresent or omit such material facts. *Schiller  v. Physicians Res. Group*, Inc., 2002 WL 318441, at 10 (N.D. Tex. Feb. 26, 2002*)*.

Moreover, pursuant to the strict pleading standard governing Section 10(b) claims, plaintiffs must plead, with respect to each individual defendant, scienter with particularity.  See *Philips v. Scientific-Atlanta Inc.,* 374 F.3d  1015 (11th Cir. 2001); *(Schiller  v. Physicians Res. Group*, Inc.,

2002 WL 318441, at 10 (N.D. Tex. Feb. 26, 2002); *Coates v. Heartland Communications*, Inc., 26 F.2d 910, 916-917 (N.D. Tex. 1998).   In *Philips v. Scientific-Atlanta Inc.*, the Eleventh Circuit examined the language of PSLRA, and, in particular, the heightened pleading requirements for the element of scienter.  The Court  determined that "the most plausible reading in light of congressional intent is that a plaintiff, to proceed beyond a pleading stage, must allege facts sufficiently demonstrating each defendant's state of mind regarding his or her alleged violations."  The Court did not perceive such a pleading requirement as posing an "unrealistic burden on plaintiffs."  In the instant case, throughout the majority of the Complaint, Plaintiffs refer to the Defendants as "the Shaws" and "Defendants," failing to identify which defendant made which alleged misrepresentation, and  failing to address  the state of  mind of each individual Defendant.  The Court, as well as the individual Defendants, may interpret the lack of specificity as to each individual defendant throughout the Complaint as the Plaintiffs alleging that both Defendants made the same misrepresentation.  The Eleventh Circuit has spoken on this particular issue, and it has been decided.

After careful review, this Court has determined that the requirements of 15 U.S.C.A.78u-4(b)(1) and (2) are not met. 15 U.S.C.A.78u-4(b)(3).  However, this Court hereby gives the Plaintiffs thirty days to amend the pleading to provide proper specificity as to the alleged misrepresentations and or omissions, and to adequately allege the element of scienter for the alleged misrepresentations and or omissions and as to each individual defendant within the meaning of Fed. R. Civ. P. 9(b) and PSLRA.  The Motion to Dismiss will be DENIED, without prejudice, subject, however, to Plaintiffs' filing of such an amended complaint within the time specified.

11

### B.  Failure to State a Claim for Control Person Liability

Plaintiffs allege that Defendants are liable for alleged misrepresentations and omissions under a theory of control person liability, pursuant to Section 20(a) of the Securities and Exchange Act of 1934. However, Section 20(a) does not create a separate cause of action but rather depends on the viability of the Section 10(b) claims.  *AAL High Yield Bond Fund v. Ruttenberg*, 2001 WL 34372980 *7 (N.D. Ala. 2001).  Further, under *AAL High Yield Bond Fund v. Ruttenberg*, "controlling person liability can exist only if primary liability has been established as to another defendant." *Id.*  If all predicate Section 10(b) claims are dismissed, there are no allegations upon which Section 20(a) liability can be based. *Id.*  This Court has already determined that the Plaintiffs  have failed to plead adequately a primary violation of Section 10(b), and consequently, Plaintiffs lack the necessary basis for this Section 20(a) claim. Therefore, on the grounds of control person liability, the Motion to Dismiss will be DENIED, without prejudice, subject, however, to Plaintiffs' filing of an amended complaint as set forth in section A. above.

### C.  Improper Venue

A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.  28 U.S.C. § 1391(b).  This Court has jurisdiction based upon federal question; therefore, jurisdiction is not founded solely on diversity of citizenship.  Plaintiffs have alleged in the complaint that part, if not all, of the events giving rise to this suit occurred in Birmingham, Alabama, in the Northern District of Alabama.  Therefore, venue is proper, and the

Motion to Dismiss will be DENIED on the grounds of improper venue.

### D.  Lack of Subject Matter Jurisdiction

Under the Securities Exchange Act of 1934, U.S. District Courts have ***exclusive jurisdiction*** (emphasis added) over violations of said Act.  Plaintiffs have alleged various violations under the Act, and, therefore, this court has subject matter jurisdiction over this suit.  *See* 15 U.S.C. § 78aa; *see also* 28 U.S.C. § 1331.  Therefore, the Motion to Dismiss on the grounds of lack of subject matter jurisdiction will be DENIED.

### E.  Lack of In Personam Jurisdiction

"Section 78aa of the Securities Act of 1934 merely requires personal service anywhere in the United States in order to properly assert personal jurisdiction, as long as that service comports with due process requirements." *D'Addario v. Geller*, 264 F. Supp. 2d 367, 389 (E.D. Va. 2003).  When a federal court attempts to exercise personal jurisdiction over a defendant in a suit based on a federal statute such as the Securities Act of 1934, which provides for nationwide service of process, the relevant inquiry is whether defendant has had minimum contacts with the United States.  *See Busch v. Buchman, Buchman, & Obrien, Law Firm*, 11 F.3d 1255 (1994).  The Defendants are citizens of the United States and were served within the United States, and, therefore, has had minimum contacts with the United States.  Accordingly, service of process was appropriate, and this court has jurisdiction over the Defendants.  The Motion to Dismiss on the grounds that the Court lacks  personal jurisdiction will be DENIED.

### F.  Failure to Bring a Compulsory Counterclaim

As stated above, U.S. District Courts have exclusive jurisdiction over violations of the

Securities Act of 1934.  *See* 15 U.S.C. § 78aa; *see also* 28 U.S.C. § 1331.  Therefore, the argument that this claim should have been brought in the pending state suit as a compulsory counter claim fails.  Accordingly, the Motion to Dismiss on the grounds that Plaintiffs' claims should have been brought as compulsory counter claims in *Edward Shaw v. Marwan Atalla*, *et al.*, District Court of Harris County, Texas, will be DENIED.

### III.  Conclusion

For the reasons set forth above, the Motion to Dismiss will be **DENIED**, without prejudice, granting thirty days for Plaintiffs to amend the Complaint and to plead their claims with the requisite specificity,  in the manner required by law.  A separate **Order** will be entered.

**DONE** this 2nd day of March, 2005.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

14